**UNITED STATES of America,
Plaintiff,**

v.

**Arthur TORTORELLO et al., Defendants.**

**No. 70 CR 884.**

United States District Court,
S. D. New York.

May 18, 1972.

Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, by Patrick T. Burke, of counsel, for plaintiff.

Elliot A. Taikeff, New York City, for defendant Tortorello.

John E. Dennett, pro se.

POLLACK, District Judge.

*The Motion Before the Court*

The defendants Arthur Tortorello (a/k/a Artie Todd) and John Dennett moved before trial to suppress tape recorded evidence obtained by electronic surveillance pursuant to state court orders made in 1969. The defendants contended that the state court orders were improperly i) sought, ii) granted, iii) renewed, and iv) executed. In addition, having-been advised on March 10, 1972, that from 1961 to 1963 Tortorello had been the subject of F.B.I. electronic surveillance in which trespass was involved, Tortorello contends that the 1961–63 federal surveillance set in motion the chain of events leading to the govern-

ment's evidence now sought to be suppressed which was obtained under the 1969 state court orders.

Decision on the motion to suppress was held in abeyance until after the trial. The questioned tape recordings were utilized on the trial by the government. The moving defendants were found guilty of all charges against them of violation of the anti-fraud provisions of the federal securities laws. In consequence, if the eavesdrop evidence was illegally obtained, the verdicts must be set aside.

The principal issue now to be considered is whether the 1969 electronic surveillance complied with Title III of the Omnibus Crime Control and Safe Streets Act (18 U.S.C. §§ 2510–20) which created uniform prerequisites and standards to be observed by state and federal authorities.

*The State and Federal Legislation*

It will be useful to review the sequence and scope of the state and federal legislation involved.

At its 1968 session, the New York Legislature passed a bill prescribing a comprehensive scheme for the restricted issuance of eavesdropping warrants,[1] based upon strict standards of probable cause and necessity and demanding scrupulous particularity in the description both of the person and place upon which the eavesdropping is to be conducted and the nature of the evidence sought thereby. N.Y. Laws 1968, c. 546. The new statutory scheme was designed to comply with the constitutional standards enunciated in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The bill became effective June 5, 1968.

Within a few days, however, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968, Title III of which relates exclusively to eavesdrop-

ping. This new federal law provided that in order to protect the privacy of wire and oral communications, it was necessary for Congress to define on "a uniform basis" the circumstances under which eavesdrops may be authorized by the individual states. The federal Act became law on June 19, 1968.

On May 26, 1969, New York State enacted Chapter 1147 of the Laws of 1969, effective June 26, 1969, which harmonized state law with federal law. Title III, §§ 814–825, Criminal Procedure Law (now Article 700 of the New York Criminal Procedure Law).

The evidence which is questioned on this motion consists of conversations of the defendant Tortorello which were intercepted and recorded by New York City's police authorities pursuant to a series of eavesdropping warrants authorized by the state court. These conversations took place at Todd Associates, 120 West 44th Street, New York, New York and over Todd's office telephone lines.

*The Interception Order of December 10, 1969*

The first order authorizing eavesdropping on conversations at Todd's premises was signed on December 10, 1969, by State Supreme Court Justice Mitchell D. Schweitzer on the application of the New York County District Attorney. The application for this order incorporated prior orders by reference which are referred to as the "Seven Orders", together with their supporting affidavits.

*The "Seven Orders" Preceding the Order of December 10, 1969*

The "Seven Orders" were a series of earlier eavesdropping warrants, the earliest of which was signed on June 2, 1969. These authorized eavesdrops at the offices and tapping of the telephone lines of Rio Coin Corporation and of Jacob Maishlish (also Jack Mace) at 1147 Avenue of the Americas.

---

1. An order authorizing the interception of wire or oral communications is called, by the New York State Criminal Procedure Law, an "eavesdropping warrant".

The "Seven Orders" were based essentially on the finding by Justice Schweitzer of reasonable grounds to believe that Mace, Tortorello and others used the Rio Coin offices and facilities to conduct illicit dealings in stolen goods and forged credit cards.

It was during the Rio Coin surveillance that the state authorities applied for and obtained a second set of State Court orders which authorized surveillance of Tortorello and eavesdropping and telephone taps at the Todd Associates office. Suspect conversations seemingly dealing with fraudulent security transactions were unanticipated fruit of the surveillance of the Todd Associates offices and facilities. The surveillance team thereupon notified federal authorities, and SEC and Joint Strike Force representatives joined the state surveillance team. It was this surveillance that yielded the intercepted and recorded communications now sought to be suppressed.

Since the validity of every step of the procedures involved in procuring the intercepted conversations has been questioned, each will be treated in turn.

### 1. *The Applications for the Eavesdrop Warrants*

The defendants contend that the eavesdrop warrants were improperly applied for because (1) the District Attorney of New York County, Hon. Frank Hogan, did not submit his application therefor in person to the issuing Justice, but acted through his assistant, and (2) the contents of the affidavits of both the District Attorney and his assistant were not sworn to by these officials in the presence of the issuing Justice but before a notary public prior to the appearance of the assistant before the Justice.

The evidentiary hearing disclosed the use of the following procedure.

Lawrence Hochheiser, an Assistant District Attorney, was assigned to the Rio Coin and ultimately to the Todd Associates cases. He prepared all of the proposed eavesdrop application papers. These were then reviewed in conference between Hochheiser and the Chief of the Rackets Bureau, Alfred J. Scottie, particularly where an original as distinguished from a renewal order was to be sought. Hochheiser then presented the proposed application papers with any conference amendments to the District Attorney himself. With one exception,[2] Mr. Hogan gave each application his personal attention, with Hochheiser at hand for clarification and discussion. At the end of the inspection and conference, both officers swore to the final form of their respective affidavits before an office notary public.

Mr. Hochheiser's affidavit recited the factual grounds for the issuance of the eavesdrop or wiretap order. Mr. Hogan averred in his affidavit that he had read the Hochheiser affidavit and that:

> Based upon the facts set forth in Mr. Hochheiser's affidavit, I respectfully submit to the Court that there are reasonable grounds to believe that the essential evidence of crime may be obtained by the interception of the wire and oral communications described [in one of the numbered paragraphs of the Hochheiser affidavit].

Mr. Hogan was the named applicant for the eavesdrop warrants. The Hogan affidavits contained both the authorization for the application and the opinion that no practical alternative means of acquiring comparable evidence or information existed. The Hochheiser affidavits also recited that the evidence sought could not be obtained except by eavesdrops and telephone tapping.

The papers were then conveyed by Mr. Hochheiser to Justice Schweitzer, who

---

2. In the fourth application in the Seven Orders series (a renewal application), Alfred J. Scottie, as Acting District Attorney, supplied the authorization affidavit. Defendants do not contend that this vitiates the fourth order, nor would it under the circumstances. C.P.L. § 700.05(5), *cf.* United States of America v. Pisacano et al., 459 F.2d 259 (2d Cir. 1972).

examined the affidavits with Hochheiser present and available for any questions, before deciding whether to grant the District Attorney's application. Hochheiser did not recall swearing to his affidavit a second time before Justice Schweitzer. Mr. Hogan did not appear personally before the Justice on any occasion.

In advancing the contention that the personal presence of the District Attorney was required before the state justice, Tortorello relies upon 18 U.S.C. § 2516(1) and (2), which designate, respectively, the federal and state officials empowered to apply for eavesdrop and wiretap orders. The defendants point to language differences in the two subdivisions which they contend call for different procedures, i. e., that whereas § 2516(1) permits the United States Attorney General to "authorize an application" to a federal judge for eavesdrop warrants, § 2516(2) provides that the state's "principal prosecuting attorney" or the "principal prosecuting attorney of any political subdivision thereof" "may apply" for similar orders to state judges. According to the defendants, construed together, the foregoing provisions "require the personal presence of [the county district attorney] before the issuing magistrate".

■ The Senate Judiciary Committee's report, S.Rep. No. 1097 at p. 98, U.S.Code Cong. & Admin.News, 1968, p. 2187, contains the following paraphrase of § 2516(2) indicating that the language difference which the defendants point out as between the federal and state prosecutors was not intended to require the state prosecutor's personal presence before the issuing magistrate:

Paragraph (2) [of § 2516] provides that the principal prosecuting attorney of any State or the principal prosecuting attorney of any political subdivision of a State *may authorize* an application to a State judge of competent jurisdiction . . . for an order authorizing the interception of wire or oral communications. [Emphasis supplied.]

As additional support for their argument, the defendants point to § 794 of the former New York Code of Criminal Procedure, N.Y. Laws 1962, c. 542, § 3, which provided in part that "The person seeking the warrant shall appear personally before the [issuing] judge, justice or magistrate. . . ." People v. Ricken, 29 A.D.2d 192, 287 N.Y.S.2d 118 (3d Dept. 1968), aff'd, 27 N.Y.2d 923, 318 N.Y.S.2d 142, 266 N.E.2d 821 (1970), held that "the use of the words 'shall appear' in section 794 intended a mandate to the applicant for the [search] warrant to personally appear before the issuing judge." Section 2516(2) of Title 18, U.S.C., requires compliance with applicable state statutes. *See* State v. Siegel, 13 Md.App. 444, 285 A.2d 671 (1971).

The short answer to the defendants' argument under § 794 is that Hochheiser's appearance before Justice Schweitzer sufficiently satisfies this provision if § 794 were deemed applicable to eavesdrop warrants. However, § 794 is probably not applicable to orders authorizing eavesdropping and wire tapping. Section 794 was contained in a title designated "Of Search Warrants" (Title II of Part IV of the Code of Criminal Procedure). On the other hand, Title III of Part IV dealt expressly with "Eavesdropping Warrants." The state laws of 1968 and 1969 each contained § 814 which provided in part that in the District Attorney's absence "applicant" should mean "that person designated to act for him and perform his official function in and during his actual absence." Thus, even if the search warrant provisions were to be read into the provisions controlling eavesdrop warrants, on the particular question of whether the District Attorney's personal appearance before the issuing justice was required, § 814 expressly overrode § 794. Hochheiser's function was consistent with this construction.

■■ The fact that the affidavits in support of the issuance of an eavesdropping warrant were taken before an office notary public prior to the time the

affiant appeared before the issuing magistrate is of no consequence and does not require the vacating of those warrants. People v. Mancinelli, 50 Misc.2d 952, 271 N.Y.S.2d 919 (1966), People v. Sullivan, 40 Misc.2d 278, 242 N.Y.S.2d 988 (1963). The rule in New York is that a search warrant may be issued by a magistrate on an affidavit previously sworn to before a notary, provided that the affiant appears before the issuing magistrate. Justice Schweitzer in fact was provided the opportunity for any inquiry into probable cause; this is sufficient. *Cf.* People v. Ricken, 29 A.D.2d 192, 287 N.Y.S.2d 118 (3d Dept. 1968), aff'd 27 N.Y.2d 923, 318 N.Y.S.2d 142, 266 N.E.2d 821 (1970). Mr. Hogan's absence is not material, for Mr. Hogan's affidavit did not supply the averments going to probable cause.

 Nothing in the Fourth Amendment required the prosecuting attorneys to swear to contents of their affidavits in the presence of a judge. The Fourth Amendment simply provides that "no warrants shall issue, but upon probable cause, supported by Oath or Affirmation. . . ." The requirement of an "Oath or Affirmation" attesting to the probable cause does not include a requirement that it be administered by or in the presence of the issuing magistrate. Veeder v. United States, 252 F. 414 (7th Cir.), cert. denied, 246 U.S. 675, 38 S.Ct. 428, 62 L.Ed. 933 (1918); United States v. Whitlow, 339 F.2d 975 (7th Cir. 1964), warrant vacated on other grounds. *But cf.* Dudley v. United States, 320 F.Supp. 456, 459 (N.D.Ga. 1970). The requirement in the law of the oath of a responsible public officer to the showing of the probable cause was to make the affiant legally responsible for any statements of fact relied upon by the Judge who issues the warrant. *See* Veeder v. United States, 252 F. 414 (7th Cir.), cert. denied, 246 U.S.

675, 38 S.Ct. 428, 62 L.Ed. 933 (1918), *cf.,* Sherrick v. Eyman, 389 F.2d 648 (9th Cir.), cert. denied, 393 U.S. 874, 89 S.Ct. 167, 21 L.Ed.2d 144 (1969); People v. Tennyson, 19 N.Y.2d 573, 576, 281 N.Y.S.2d 76, 227 N.E.2d 876 (1967). *But cf.* Rose v. United States, 45 F.2d 459, 464 (8th Cir. 1930). Clearly, this objective is accomplished when the affidavit is sworn to before an office notary public as well as when administered by or in the presence of the magistrate.

## 2. *The Subject Matter of the Investigation*

 The defendants contend that the object of the investigations was not within the scope of the offenses designated in the statute for which eavesdropping warrants are issuable. The "designated offenses" are described in 18 U.S.C. § 2516(2) and include investigation of any "crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year." [3]

In the first Rio Coin order, Justice Schweitzer found that "there are reasonable grounds to believe evidence of the crimes of robbery, burglary, possession of weapons as a felony, forgery as a felony, possession of forgery devices, grand larceny, criminal possession of stolen property as a felony and conspiracy to commit said crimes may be obtained by intercepting. . . ."

Justice Schweitzer's finding has a firm basis in the application of the District Attorney; the affidavit of Hochheiser describes in detail the criminal conduct of Jack Mace and his associates. The detection of organized crime fencing, which has a necessary and immediate connection to the offenses specified in the order, was a plain purpose of the Mace-Tortorello investigation. The Senate Report makes clear that the provisions of the statute were enacted "to make it possible to strike at organized

---

3. Among these crimes, § 2516(2) expressly designates the offenses of murder, kidnapping, gambling, robbery, bribery, extortion and dealing in dangerous drugs, but without limiting the offenses available for investigation to that list.

crime fencing." (p. 98 U.S.Code Cong. & Admin.News, 1968, p. 2186).

The Report, moreover, explains the limitation to crimes "dangerous to life, limb, or property" as follows (S.Rep. No. 1097 at p. 99 U.S.Code Cong. & Admin.News, 1968, p. 2187):

> This limitation is intended to exclude such offenses as fornication and adultery, which do not involve danger to life, limb, or property. The term "property," however, is not to be read restrictively. For example, the activities of organized crime in "cigarette bootlegging," which pose a substantial threat to the revenue of some cities and States, could be made a designated offense if the penalty were made high enough.

Accordingly, there is no merit to the contention of the defendants that the offenses sought to be unearthed by the investigation were not within the statutory "designated offenses".

3. *Particularity of Application*

■ The defendants contend that the applications for the orders were not sufficiently particular. 18 U.S.C. § 2518(1) (b). There is no substance to that criticism. The affidavits detail suspected fencing operations. Their breadth reflects the wide scope of the suspected criminal activity rather than an improper intention on the part of the state authorities merely to secure a "roving commission". The more appropriate inquiry, which will be treated hereafter, is whether probable cause for such an investigation was sufficiently shown. *Cf.* U. S. v. Becker, 334 F.Supp. 546, 549 (S.D.N.Y.1971).

4. *Sufficiency of Normal Investigative Procedures*

■ The next contention is that the applications for warrants failed to show that normal investigative procedures had been tried and had failed, or appeared unlikely to succeed if tried. Section 2518(3) (c) of Title 18, U.S.C., requires the magistrate to make the required finding on the basis of the appropriate averments in the supporting affidavits. The finding as expressed here was that the Judge was "satisfied that *comparable* [emphasis supplied by defendants] evidence essential for the prosecution of said crimes could not be obtained by other means". This is a sufficient and appropriate finding when read in the context of the attached affidavits.

■ There is nothing in § 2518(3) (c) which requires that particular words be used in the requisite finding or indeed that the finding be actually expressed in words rather than by the act of the Judge. *See* United States v. Escander, 319 F.Supp. 295, 304 (S.D.Fla. 1970); *cf.* United States v. Poeta, 455 F.2d 117, 120 (2d Cir. 1972); United States v. Focarile, 11 Cr.L.Rep. 2008 (D. C.Md.1972); United States v. Leta, 332 F.Supp. 1357, 1362 (M.D.Pa.1971). "Substantial compliance" is all that is required by § 2516(3) (c). *See* United States v. King, 335 F.Supp. 523, 535 (S. D.Calif.1971).

5. *Probable Cause to Monitor Tortorello*

■ Defendants contend that probable cause to monitor the Rio Coin shop with respect to Tortorello's conversations did not exist to ground the first order in the Rio Coin series and that this defect invalidates each succeeding order as to Tortorello in the Rio Coin and Todd Associates sets. They do not contend that probable cause was absent with respect to the conversations of Jack Mace at the Rio Coin premises; indeed there was ample probable cause. Their argument, in essence, is that there must be a discrete finding of probable cause in respect to each identifiable person known to use the facilities in question in order to authorize an intercept of that person's conversations; and that such a requirement was not satisfied as to Tortorello.

The same conventional surveillance which produced the plainly sufficient probable cause for eavesdrop warrants with respect to Mace yielded the information that Arthur Tortorello was custo-

marily present with Mace at the shop during the course of the latter's dealings. Regular meetings of the two were observed in the vicinity of the partition within the shop "particularly behind it". The proof showed that both Mace and Tortorello have criminal records and that an informant reported overhearing conversations between the two in respect to stolen goods. It was shown that the informant was an associate of Mace and that the informant knew him to be a fence. Independent conventional surveillance of the Rio Coin shop corroborated that the informant did, in fact, know and associate with the two.

■ Nevertheless, the defendants question whether the report of an informant of "unknown reliability" may be considered on the issue of probable cause as to Tortorello. This question is resolved against Tortorello by United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), which sustains as sufficient the indications of the informant's reliability supplied to Justice Schweitzer. The independent surveillance by the state agents and the reports of other informants supplied the requisite corroboration and the indicia of trustworthiness of the questioned informant. *See also* United States v. Alonzo, 447 F.2d 126 (2d Cir. 1971); United States v. Gardner, 436 F.2d 381 (2d Cir. 1971); United States v. Becker, 334 F.Supp. 546, 550–551 (S.D.N.Y. 1971) (Weinfeld, J.).

■ Incidentally, the statements of Tortorello in conversations in which Jack Mace participated would be admissible at all events. *See* United States v. Perillo, 333 F.Supp. 914 (D.Del.1971); United States v. King, 335 F.Supp. 523 (S.D.Calif.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla. 1971).

### 6. *Renewals of Warrants*

Defendants contend that even if the first of the Rio Coin and Todd Associates orders were valid, the renewals of those orders were invalid because they were based on no "further accretion of evidence uncovered either by the operation of the first eavesdrop or by conventional investigative techniques in the meantime."

■ This argument lacks any force since "fresh probable cause" *was* provided, and based each renewal order. The applications appended to the renewal orders indicated present probable cause in each case. Each renewal affidavit showed that daily transcripts of the intercepts were forwarded to Justice Schweitzer and each affidavit contained fresh evidence of probable cause, both by summary of and by direct quote from the transcripts. This Court was not requested to go behind these affidavits nor was any such issue relating to the renewal affidavits raised at the evidentiary hearing on this motion. The contentions as to the propriety of the renewal orders lack force. *Cf.* United States v. King, 335 F.Supp. 523, 537 (S. D.Calif.1971). The requirements of Berger v. New York, 388 U.S. 41, 59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), that there should be a showing of present probable cause for the continuance of eavesdrops, were adequately satisfied.

### 7. *Manner of Execution of Warrants*

■ The defendants also contend that the manner in which the intercepts were conducted resulted in monitoring and recording of a mass of non-pertinent and irrelevant conversations in violation of *Berger, supra,* and of § 2518(5). However, it appears sufficiently that genuine and acceptable safeguards and efforts were made to minimize the interception of non-pertinent conversations in compliance with the statute.

The defectives who monitored the Todd Associates conversations testified to compliance with their instructions from Hochheiser and these were reasonably designed to assure conduct of the eavesdrops in such a way as to minimize the interception of non-pertinent communications. One of the detectives was familiar with the earlier monitoring at the Rio Coin site preceding the eavesdropping re-

**1038**

lating to the Todd Associates site. The testimony of the detectives and their daily records or line sheets indicate that they complied with their instructions during the interceptions. The line sheets indicate the time a conversation deemed pertinent commenced and ended and the nature of that conversation, and also contain entries noting the time non-pertinent calls or conversations were initiated. There were no gaps in the monitoring to be explained. The detectives testified that they monitored without significant exception only when they were also recording. This reduced or eliminated the opportunity for an improper eavesdrop which would not be recorded.

Obviously, some non-pertinent items crept in because they were recorded before a determination of their relevancy could be made. Other such items were included because they appeared in conversations also containing pertinent items. Still others represented a determination of pertinence with which the Court does not necessarily agree. However, overall, the excess items were *de minimis* and the compliance reasonably conformed to adequate rules set down for the intercept. *See* United States v. King, 335 F.Supp. 523 (S.D.Calif.1971); *cf.* United States v. Scott, 331 F.Supp. 233, 246 (D.D.C.1971).

The defendants raise a further issue relating to unanticipated evidence. They claim that the execution of the warrants was illegal because evidence was obtained thereby relating to stock fraud during the Todd Associates intercepts although the orders for the eavesdrop warrants were for the purpose of collecting evidence concerning stolen travel tickets, credit cards and the receipt of stolen goods.

According to the defendants, the collection and use of such evidence, indicates that the orders were used as "roving commissions" in violation of Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), and Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

Eavesdropping evidence of a crime which is the unanticipated and unexpected fruit of monitoring directed at other alleged crimes is not *per se* illegal. The unanticipated evidence is admissible in a prosecution in which such proof is relevant. United States v. Cox, 449 F.2d 679, 683–687 (10th Cir. 1971). Valid applications and orders validly executed permit the use of unexpected conversations that have been garnered, although they deal with other crimes than those which have initiated the intercept. 18 U.S.C. § 2517(5).

8. *The Effect of Prior Illegal Wiretaps*

The final contention of defendant Tortorello is that the evidence in question was procured by a direct exploitation of a prior illegal eavesdrop which was used by F.B.I. in 1961–63 or more than six years before the instant order of December 9, 1969. For purposes of this discussion the Court will even assume that these prior F.B.I. intercepts may have been directed at suspected stock fraud and that they were illegal (although there is no such proof now before the Court). That assumption obviates any need for production of the earlier intercepts.

With the illegality of the prior surveillance assumed, the government has the burden of showing beyond a reasonable doubt that the proof used at trial was free of any taint of that illegality. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); U. S. v. Schipani, 289 F.Supp. 43, 63–64 (E.D. N.Y.1968), aff'd, 414 F.2d 1262 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S. Ct. 902, 25 L.Ed.2d 102 (1970); United States v. Cole, 325 F.Supp. 763, 768 (S. D.N.Y.1971) (Pollack, J.). *But cf.* U. S. v. Friedland, 441 F.2d 855, 856 (2d Cir. 1971).

The government has established by credible evidence beyond a reasonable doubt that the proof used in the trial stemmed from a legal source and was free of any taint of illegality.

The information obtained under the December 10, 1969, order was accounted for as to source.

The Hochheiser testimony at the evidentiary hearing established that the Todd Associates intercepts derived from the surveillance of the Rio Coin shop; that the Todd Associates surveillances were directed by state authorities at suspected dealing in stolen stock; that during the course of these intercepts, unanticipated conversations with known stock manipulators and swindlers were monitored which concerned matter involving corporate affairs of certain named and unnamed corporations, and that SEC people and the Strike Force were then called in by the state authorities in relation to the unanticipated disclosures.

It plainly appears that those involved in the prosecution of this case had no knowledge of the illegal eavesdropping on the part of the government. In the March 2, 1972, Burke affidavit, the averments of which were not challenged, the prosecutor avers that neither he nor "any member of the prosecutorial team" was ever aware of the prior surveillance of the F.B.I. until the attorney for the defendant asked about it after the case was tried and an inquiry then sent to Washington resulted in the February 28, 1972 letter from the Justice Department disclosing the same.

It may well be that the protection afforded to the defendants does not depend upon the existence of such knowledge. *See Cole*, 325 F.Supp. at 771; *but cf. Friedland*, 441 F.2d at 859. However, it depends at least upon whether the government's evidence used on the trial of this case was yielded by or resulted from the eavesdropping in 1961–63. That is not the case here.

▇ Additionally, it appears beyond reasonable question that no substantial portion of the case against the defendants was a fruit of any poisonous tree. In such a situation, a conviction may not be overturned. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The significant evidence in this case was all of independent and recent origin. There is no reasonable possibility that a substantial portion of the case was tainted.

*Conclusion*

The defendants' motions based on unlawful electronic surveillance present contentions which individually and collectively are wanting in substance and in merit and the motions are, in all respects, denied.

The foregoing shall constitute the Court's findings and conclusions.

Presentence reports will be ordered herein. The date fixed for sentence is June 30, 1972 at 10 A.M.

So ordered.